Mr. Ferguson, whenever you're ready. Morning, Judge Wilkinson. I'm ready. Morning, and may it please the court, Andrew Ferguson representing Dr. Mark Amonette. When direct acting antivirals first became an available treatment for hepatitis C, Dr. Amonette had to make a decision about how to allocate scarce treatment resources. So he issued prioritization guidelines, similar to prioritization guidelines issued to address the same subject matter across the country in states and in the Federal Bureau of Prisons. The district court held that those guidelines violated the clearly established Eighth Amendment law. That decision was error. The district court failed to define the right at issue with sufficient specificity, and this court should reverse on that basis. The purpose of qualified immunity is to protect officers from personal liability, except in cases where the constitutional issue is beyond debate. The issue is, Judge DiIessius, I'm sorry to interrupt you, but you mentioned that the court, the district court found that Dr. Amonette was indifferent, deliberately indifferent. But I thought what the court found was that there was a factual question as to whether or not the doctor was deliberately indifferent, because a jury could reasonably find that instead of a strategy to deal with limited resources, this was in fact a strategy, excuse me, a strategy designed to exclude inmates from treatment. So given that kind of fact, that factual dispute, we're here on an interlocutory appeal. I mean, if we accept that view of the evidence and we have to because we can't resolve factual disputes, you know, on that record, isn't isn't there enough to affirm the district court? Respectfully, Your Honor, for the following reason, this court under Danzer against Sandsbury never has to defer to a district court's determination that there's a dispute of material fact. In other words, materiality is contingent on the substance of the right at issue. But if the district court is wrong, that apparent dispute of fact is material, this court doesn't need to defer at all. In fact, it's not supposed to defer. And here, the district court was simply incorrect that the dispute that it conjured was material because it's wrong about the Eighth Amendment. The Eighth Amendment requires a plaintiff in order to prevail. And at summary judgment, they have to be put to the burden of their proof. In order to prevail, the plaintiff has to show that the defendant knew of the substantial risk, knew that the acts the defendant undertook to address the substantial risk were so woefully short that they shock a conscience and yet proceeded anyway. The district court flipped the burden of proof the same way that the district court did in Hoffer against Florida Department of Corrections where the 11th Circuit reversed. The district court said, well, look, there's a dispute about whether Dr. Amanet had sufficiently tailored these prioritization guidelines to the shortages in the prison system. That is the backwards way to do an Eighth Amendment claim. To prevail on an Eighth Amendment claim, the plaintiff needs to show that Dr. Amanet, in fact, knew the guidelines were insufficient. Mr. Ferguson, before we even get into the deliberate indifference, My position is that there's a threshold question of law, not a dispute, not a question of disputed fact, and that the threshold question of law is whether the district court framed the right in sufficiently specific terms. And what the Supreme Court has told us time after time after time again, what multiple courts have said in order to give a defendant notice as to what behavior is permitted and what is not, the right alleged to be violated has to be framed in specific terms. As I understand it, that's a question of law, whether it's framed at a sufficiently specific level. Is that correct? That is absolutely correct, Judge Wilkinson. And if I'll elaborate, it is absolutely correct. The Supreme Court has been elusively clear, particularly over the last decade, that in qualified immunity cases, the right has to be defined with sufficient specificity in order to vindicate the interest that is the purpose of qualified immunity. And that's a threshold issue. Before you get into deliberate indifference, that's a threshold issue. That's absolutely right, Your Honor. After Pearson against Callahan, this court can choose to address the qualified immunity defense either by addressing the clarity with which the right was established at prong two or the right itself at prong one. So unequivocally, the clarity of the establishment of the right can be a threshold question, and we think it is sufficient to reverse the district court. Excuse me. If we decide if we were to go the qualified immunity route, there has to be something more specific than saying, well, there's an Eighth Amendment right to adequate medical care or whatever. Because once you get into that, that's as broad as all outdoors. That could mean anything, adequacy or what have you. And it seems to me, though, that under the Supreme Court's decisions, they've done two things. Number one, they've required that the right be framed in a very specific manner and that that is a question of law and that that is a threshold question. That's the way I understand the analysis to go. When it's framed as a specific question about the right to treatment with DAAs, there have been multiple courts that have rejected that there's the specific right, that that specific right exists. And people are getting, courts are getting reversed right and left on this qualified immunity ground for a failure to to first frame the alleged right that's violated in sufficiently specific terms. I agree entirely. Judge Wilkinson, a cottage industry at the Supreme Court has emerged over the last seven years of having to summarily reverse courts of appeals who fail to frame the right with sufficient specificity. The framing of the right is important because qualified immunity is intended to ensure that officers have fair notice of their constitutional obligations when they undertake official conduct. That is particularly important in Dr. One thing I want. One other thing I wanted to ask you, it seems to me that the Emmanette and Wang are in somewhat of a different situation. As far as Wang is concerned, it seems to me he was more intimately involved in the treatment of this individual. It might be that a deliberate indifference analysis, whatever, is more appropriately applied to him. But as to Emanette, it seems to me that a qualified immunity analysis is more applicable to him. It just seems to me that the specificity issue that you frame is more compelling as it relates to Emanette. And then when you get into Wang, you have to ask the more factually laden question about whether there was a disregard of a known medical risk, conscious disregard of a known medical risk. But don't the defendants go off in different roads on different roads here? Judge Wilkinson, my time has expired. I assume it's OK if I answer your question. Yes. So I will leave the specifics of Dr. Wang's case to the principal deputy solicitor general who are after me. But I will say this about this potential dichotomy. Qualified immunity is most important with regard to officers in Dr. Emanette's position who have to set system wide policies for a wide range of situations. The whole point of qualified immunity, as this court has said, is to impose personal liability for the breach of right constitutional red lines, not for decisions made in difficult gray areas. That is precisely the situation that confronts a system wide administrative official like Dr. Emanette when there are new treatments and shortages of available treatments. And qualified immunity needs to be applied most robustly for officers. All I'm asking you is a simple question of whether the qualified immunity analysis you're putting forward may be more applicable to Mr. Emanette, Dr. Emanette than it is to Dr. Wang. Dr. Wang produces raises, it seems to me, a different kind of question. You agree with that? I do. I do think that the application of the Eighth Amendment and therefore the application of qualified immunity will differ when you are comparing a treating physician who's actually attending a patient against a system administrator like Dr. That's what I'm suggesting to you. Yes, I think that although the rights should be framed similarly because the rights are implicating the same issues. The analysis will not necessarily be the same when you're considering a treating physician and a system administrator like Dr. Emanette. All right. I'm sorry before you sit down. Judge Diaz, did you have a question? I do. Yes. So, Mr. Ferguson, how would you have the court? How do you think the district court should have defined the right with respect to these particular drugs in the administration of these drugs? The position that Dr. Emanette has taken in his briefs is that the right is best defined as the right to receive DAAs if you are diagnosed with hepatitis C. I do think that that is the right way to frame the right because this treatment is so new. There was a dramatic departure from the way that everyone in the country had been treating hepatitis C because of the recent arrival of the drugs. I don't think that a officer fairly had been on notice of anything more than that, which is why framing the right with this sort of specificity is important. Well, and I appreciate that because there's obviously there's a balancing act here. You don't want the right to be framed too generally because that's unfair to the officials. But on the other hand, if the right is framed too specifically, then effectively you have to wait until a court decides that a precise medical condition and symptoms are at issue or in play. And that's unfair to the inmates. So in this case, I mean, we got past the question of whether or not these drugs were appropriate treatment. The question is whether or not the doctor, your client in this case, appropriately administered those drugs in the manner in which he set up the program. And from the district court's perspective, I go back to my first question. The district court in this case suggested that there was a disputed issue as to whether or not this was a system designed to harness and most effectively use limited resources or whether the doctor intentionally deprived inmates arbitrarily of the right to treatment. And framed in that context, I don't see why that isn't an issue for the jury. With respect, Judge Diaz, again, I'm not taking issue with the alleged dispute of fact. I'm taking issue with the district court's determination that the dispute is material, which is purely a question of law because materiality turns exclusively, of course, on the content of the right at issue. Well, how could that be material? Because what the district court said is, I believe there is a dispute because Dr. Amanat didn't put on evidence that he knew exactly how many patients had hepatitis C in the Department of Corrections system, which is also wrong as a matter of the record. Setting that aside, that he didn't know how many patients had hepatitis C, and he wasn't aware of how many primary care physicians could prescribe the DAAs on the ground, given that most primary care physicians did not have facility with the DAAs. And the district court is simply incorrect that that is the relevant Eighth Amendment question because it flips the burden of proof exactly the same way the district court did in offer against Florida Department of Corrections and on which the 11th Circuit reversed the district court. The question in an Eighth Amendment case is, did the defendant know of the substantial risk, know that the measures that he or she was taking were so woefully insubstantial that they shock the conscience and proceed anyway? The district court's holding is, well, there's ambiguity about how much he knew. If there's ambiguity about how much he knew, the Eighth Amendment claim fails because knowledge is the necessary component of the Eighth Amendment. All right. Thank you, Judge Diaz. Did you have any further questions? Judge Wynn? No, not, thank you. All right. Let's hear from Ms. Mailey. Thank you, Your Honor. May it please the court, I'm Erica Mailey representing Dr. Lawrence Wang. I'd like to begin, if I may, with an issue that's particular to Dr. Wang, and that is the question of sovereign immunity. The Supreme Court of Virginia's recent ruling in the Patterson v. Danville case, which we submitted in our 28J letter, makes clear that Dr. Wang is entitled to sovereign immunity on the medical malpractice claim. Patterson instructs that courts should look to the case with the closest factual parallel. And in this case, that's clearly Patterson itself. Just like this case, Patterson involved a doctor... ...in terms of the Patterson case, which also applied to Dr. Wang. But why don't you go into the question of whether there was deliberate indifference under the facts here in terms of the federal cause of action. Certainly, Judge Wilkinson. As to the qualified immunity analysis, the prong, too, that Dr. Amanat's counsel was addressing does overlap a good deal with the claims of Dr. Wang in that the right was applied the same way to both of them, and for both of them, it was defined at far too great a level of generality. There is also in that... Dr. Amanat was at a level, he's the chief physician here, and he wasn't involved in the treatment of this particular individual. And he didn't really get into the specifics, case by case, of when someone would warrant an FIB score or an FIB scan, and when they were not, and he didn't hold the individual sessions with this inmate. And so why... It seems to me that the two defendants are differently postured here. That doesn't mean you lose. It just means that I think you need to argue your case in terms of deliberate indifference and the way in which that differs from a negligence standard and why Dr. Wang's behavior may have been negligent. He admits he made a mistake. But why that doesn't rise to the level of deliberate indifference? Now, why don't you go and tell me what Dr. Wang did with respect to this individual inmate? Just as you said, Judge Wilkinson, he did make an error. He confused two of the aspects of the Department of Corrections guidelines. There was separate cutoff points for the APRI score, which was 1.5, and for the FIB score, which was 1.45. And he got those numbers confused and mistakenly believed a cutoff point. Ms. Milley, can I ask you about that? So in response to that, the district court said that your client, Dr. Wang's defensive mistake hinged on his credibility, whether or not, in fact, this was a mistake, which the court said it was not appropriate to consider on a motion for summary judgment. And so, again, this raises the same issue of whether or not this kind of factual dispute, credibility dispute, is appropriate for us to consider on an interlocutory appeal. I think the Danzer v. Stanberry case that Mr. Ferguson was discussing is highly instructive on that issue as well. And Danzer was similarly an interlocutory appeal that involved questions about the officer's mens rea. And the court in that case held that this court can look at the facts in the record that the district court considered and any other undisputed facts in addressing the legal question of whether that demonstrates the required mens rea of deliberate indifference. And we're asking the court to do the exact same thing here. Okay, so if we do that here, I mean, the record suggests that on three different occasions, your client basically ignored the guidelines that would have suggested that this inmate should have gone, at least from a plaintiff's perspective, three different occasions, ignored the guidelines that would have suggested further testing on the part of the inmate. And then when he did finally order the testing, the fibroscan, it didn't follow up until I think over a year had passed before he finally got the test that he had ordered initially. And so why couldn't the jury find that on those facts, those repeated omissions amount to deliberate indifference? Respectfully, Judge Diaz, that's not quite correct. There were two occasions on which he was slightly over the 1.45 cutoff. Well, I want to make sure, I want you to minimize that. I could take off a manner that has been taken off in other instances on how bad the situation is. A man's in prison, he has his hepatitis C, he is entitled to this treatment. The doctor comes up and says he makes a mistake. Well, his mistake cost this man his life. And I mean, it's right there, he's entitled to it. So I don't minimize it to say, well, maybe not three times or whatever. The fact of the matter is that treatment was there. That level of treatment has been proven to be quite effective. But by the time you got to this man, it's too late for that. That's the case we just handed down in June on Fort versus Clark. I think that has some applicability here. And when we begin to look at the particularization needed for Fourth Amendment cases, Clark made it clear that's not necessary for Eighth Amendment type cases. And Clark even goes further in terms of talking about deliberate indifference in the context of what we're talking about. But at the end of the day, no one says your client wins or loses. It goes back to Judge Diaz's point when you were talking about credibility. Why would we go there? That's the jury determination. Ms. Buckley, I don't think it is a question of credibility. And that's because deliberate indifference is such a high standard. Didn't the trial court say so? The trial court did say so, but that is an error of law considering what deliberate indifference requires. It's akin to criminal recklessness. And it requires that he must have been actually subjectively aware that there was an excessive risk to Mr. Fowler. And he must have actually been subjectively aware that the medical care he was providing was inadequate in light of that risk. If we look at the objective evidence, you've got the guidelines right in front of you. Doctors should know what guidelines are, particularly when you're dealing with something as serious as this. He said, I made a mistake. And you said, that can't be credibility. There's some just objective factors. That's not true. It's not a matter of his credibility. In other words, we have to believe it. Do we? Is it necessary? Just because he said he made a mistake, does that end it as a matter of law? In these circumstances, it does, because there is no evidence that could show that it was done deliberately with actual knowledge. And many cases of this type show that. Not even medical malpractice cases, but when you've got the medical guidelines and any standard of practice, you ought to know what it is in treating these kinds of patients. And you overlook it twice and deny him treatment. What more do you need? It's a different standard. It's not a question of what a reasonable doctor would have known. We're not doing a medical malpractice case. I got that. But we are doing one that deals with credibility. What we're saying is the evidence. The evidence of his word saying it's a mistake would simply say, anybody that's in this situation, all you've got to do is just say, no, I made a mistake. That's the end of it. This puts us in a number of cases, including Parish versus Cleveland, that when you don't have direct evidence of the knowledge and you're inferring it from the obviousness of the risk or the error, then it has to be so obvious that it would conclude that he had actual knowledge because he couldn't have failed to have actual knowledge. And that's just not the case here, especially considering Dr. Wang was a generalist. He wasn't an expert in this area. And the standards were new and they were complex. I mean, you're very forthcoming. I think what the case does indicate, if there's an issue of material fact, and that's key, fact, that we're talking about, and establish that fact on this credibility, meaning as to the difference, then the question is, does it affect the serious medical needs? That's the question. Is there material fact? If that fact is based upon someone's word, and the court says it's credibility. I think my time is expired tonight. Yes. We're not disputing in this interlocutory appeal that there was a serious medical need. The question goes to whether the record was such that properly construing the deliberate indifference standard, there was a material dispute of fact. And our position is under these facts, considering how high a mens rea that is, that there is not. Thank you. All right. Thank you. We would now like to hear from Mr. Sherman. May I place the court? Good morning, it's John Sherman, on behalf of the estate of Danny Farlow. Mr. Farlow died in prison, died in a cot, in a gym, in pain, unnecessarily. He went into prison in 1999 with Hepatitis C, had been dealing with that, had been treated for that, and then it gets to the point in... Well, you know we know the facts. Why don't you go to the issues? I'll go straight to the... Go to Judge Wilkinson's question regarding the position we take with Wayne, and as to Amarette. Do they differ insofar as our analysis on sovereign immunity? No, Your Honor. On the strict legal question of the threshold question as to the right that was violated, if you'd like I can discuss Dr. Amarette's position in terms of his deliberate indifference, because with all respect to counsel, it wasn't an issue of prioritization. The district court refuted... But they do differ. The facts and circumstances do differ somewhat, don't they? Well, of course, Dr. Wayne was a hands-on treating physician. Doesn't that make a difference? Well, it doesn't make a difference, I believe, to the fact that both were deliberately indifferent. It's got to make a difference, counsel. They were totally differently situated, and what Dr. Amarette was doing was taking a novel treatment, and he was trying to set priorities. And it's a very detailed set of priorities here. And he had to allocate a set of scarce resources, because as I understand it, the VCU or the Medical College of MCV Clinic didn't have an infinite number of openings. So he was trying to set up a system. As I say, he's plowing somewhat novel ground. And the whole purpose of qualified immunity is to provide this man notice. And he's not provided any notice by the fuzzy general comments that the district in which the district court framed the right. And we're going to be marching into a nest of machine gunfire if we deny this individual qualified immunity because multiple courts have rejected the idea, a number of them, that there's a specific right to treatment with DAAs or in the antiviral. And the Supreme Court has said, you've got to frame this right with specificity. And he's he's trying to set up a system here. And to all to the best of my knowledge, I can't understand why the system was in any way deficient. Now, it's a different question raising different issues as to whether the system was properly applied. But there's a whole lot of difference here in terms of this case between someone who is the treating physician and dealing with this individual on a day-to-day basis and someone who is setting up an overall system for the allocation of a scarce medical resource. And they simply however it comes out is simply implicate very different means of analysis. And all I can tell you is that these have not just been reversals. They've been summary per curiam reversals where courts of appeals and district courts have failed to frame rights in sufficiently specific terms. Now, Judge Diaz makes an important point I think and that is that you can't insist on so much specificity that you have to wait for a court to rule on all fours or all three     what I'm saying. I'm saying that with an identical set of facts or whatever that destroys the balance. But surely something more was due this doctor and I'm talking about Aminef here which raises different questions from Wang. Surely something more was due by way of notice for this individual than was given by the way the district court framed the right. That's what I'm saying. In the balance between generality and ultra generality and ultra specificity this seems so clear to me in the other side of the line because anybody can say well the eighth amendment protects the right to adequate medical care. The fourth amendment protects the right to unreasonable searches and seizures. The first amendment protects the right to free speech and you have to do something more than that and I think that's the difference between negligence and deliberate indifference and where on that fault line Dr. Wang falls. I just think the case against Ammonette is singularly weak and I just say looking down the road it's going to be a rough ride with these kind of cases where they if and when they go up to the Supreme Court. If I could just focus on what the District Court found to be a dispute of material fact in terms of deliberate disregard of Dr. Ammonette. The District Court found it's a dispute   terms of deliberate disregard of Dr. Ammonette.      District Court found to be a dispute of material fact in terms of deliberate disregard of Dr. Ammonette. And I think that's one            And the District Court found it's a dispute of fact as to whether it set up a system where you could not get  treatment  early stage. And they said anyone, it's best to get treatment at an early stage. There's nothing here that speaks to a right to treatment with DAAs or antivirals for hepatitis C. There's nothing that addresses that. And the District Court relied on the Sinto case on this court  they followed the Supreme Court in Elkid where Elkid says you cannot have a high level of generality but it is improper but it is too difficult. In the Sinto  it was an inmate who needed an insulin shot. He needed medical care when he was in lockdown and emergency medical care when he needed it. Those were found to be far too specific. When the contour is tailored to the very action in question it opens the door to the fact that no official would ever be under notice unless it is the specific act in question and that would be unworkable. But you have talked about adequacy and you have talked about early medical treatment and this and that could apply anywhere. What you are talking about are medical professions trying to set up institutional guidelines. As I understand it, these institutional guidelines apply to all inmates. Is that correct? These specifically apply to inmates with hepatitis C. How could they be exclusionary if they apply to all inmates with hepatitis C? They seem to me that those standards were framed in a neutral way and an objective way and dependent upon test scores. These new drugs, and I say new in the sense that they were being rolled out but they have been around for a long time and the benefits were recognized by everybody including Amanet, these drugs were not accessible to an inmate in the Virginia Department of Corrections until they reached that certain level. That certain level was too high. You couldn't get there until you were so sick that the drugs may or may not help. So it was exclusionary in the sense that you were excluded unless you were sick enough to get it. But in fact, medical evidence  Amanet was aware of was that you should get it at a very early stage. And it's not prioritization. These are complicated things. I'm not a medical professional, but I would have followed the guidelines of this association of liver disease, the ASDLA, which had it about 1.2, which showed that if there's any so these scores, they measure scarring in the liver. I would say if there's any scarring in the liver and these drugs are so effective at an early stage, I'd say give it to the person to save their life and down the road to prevent further health care costs. That's what I would have done. But in any case, in terms of what the court found was a genuine issue of material fact as to whether it was exclusionary or a prioritization. The system where there was a prioritization because of resources, I think it was used in the federal prison system, they had a committee to review decisions and make sure cases were not subject to prioritization. So that wasn't applicable. But getting to Dr. Wang, if I may, for a couple of minutes, there is a different disregard issue. Because Dr. Wang, as the court below said, essentially turned a blind eye to these tests. One after another, everyone makes a mistake, but you make a mistake the first time and you repeat it a second time. When the mistake is found and time has passed, you don't put him to the front of the line for these five scans. That's deliberate indifference. He was treated, I mean, he was tested repeatedly between April 2015 and May 2018. He had blood tests at least six times. And as I understand it, the difference between negligence and deliberate indifference is that you have to recognize that human beings are not infallible. I wish we were infallible. It would make life a lot easier. But human beings make mistakes. And in the vast run of cases, those mistakes occur through negligence. But you can understand how the mistake was made here because the FIB cut off of the second category was 1.5, not 1.5, not 1.45, which was the same as the APRE cut off for the first category. So did he make a mistake? Yes. But is that a conscious disregard of a known medical risk? I mean, the very definition of a mistake is that you put it into the category of a negligent infraction. And when you look at Estelle V. Gamble, it made so clear that deliberate indifference was a different standard from negligence. And yet somehow in the lower federal courts, the standard has bled into negligence. And I'm wondering if this isn't one of those cases, because if he tested him repeatedly, he saw him repeatedly when the on the third visit, Wang ordered a Fibro scan with ASAP instructions. So you can quibble with it, but I wonder whether there's a conscious disregard of a serious medical risk or whether it belongs in the large category of unfortunate human behavior that we talk about as negligence. Yes, Your Honor. And what the court found in this case, what the district court found in this case, was that there was a genuine issue of fact on this point, a triable fact, because there was the first instance of making the mistake on the readings, and that was his job to use those guidelines. The guidelines were right before him. So where was the conscious disregard of a known medical risk? Where did he just consciously disregard it? That's what the standard is. Right, well, I think the circumstantial evidence of making that mistake twice goes to conscious disregard. And then in the third instance, he was referred, he was referred, but in the period of time before he finally got his scan, he saw Dr. Wang again, and Dr. Wang didn't follow up with him to move that forward. There was a three or four-month period that passed, but Dr. Wang did nothing after the first referral. I think that comes closest to conscious disregard, and I think that's why the court below found that in fact there is a genuine issue of material fact that should go to a jury on that case, and I would say that that's the appropriate forum. It should go to a jury, and a jury should determine whether that standard of deliberate indifference has been met, or whether it is negligence, but I think that's truly a fact question that the court has described. The legal question as to whether the contours of the right, whether Dr. Wang was on notice that he was violating a right, I believe that the right articulated by the court was not   right, but I think that the court has given a diagnostic test over the course of his treatment that included a fibro scan, a liver ultrasound, an abdominal CT scan, liver biopsy, and MRI. I mean, there are many, many patients who are dissatisfied with their course of medical treatment. I think in this case, because of what we characterize as the deliberate indifference of Dr. Wang, by the time Mr. Fowler got his scan, by the time the VCU was brought in and it was determined that he had terminal liver cancer, that could have been prevented by the use of the direct acting ... There are easy cases I suppose where deliberate indifference standard can be met. I mean, if Dr. Wang had done absolutely nothing in the face of a diagnosis of cirrhosis, that's an easy case. Judge Wilkinson's point is that all along this course of treatment, he was treating him and doing things within the realm of professional medical judgment, and on three, two separate occasions with respect to the misdiagnosis of the guidelines, and then the third time when he failed to follow up promptly with respect to the tests that he had ordered, I guess the question is whether or not those three instances, taken in the context of the broader treatment that was afforded to your client, whether that actually raises a genuine issue of material fact for a jury to decide. If I may, your Honor, I know I'm out of time. Yeah, please. I think it was addressed in the Gordon B. Schilling case. Monitoring is not treatment. Monitoring this man because he had Hep C since 1999 is not treatment. When it was not treatment, he didn't calculate it. He didn't realize when those guidelines required him to do. In the third instance where he just ignored his own prior report to send this man on, who at that point had visible symptoms, fatigue, stomach and elsewhere. Do you have any further questions? Do you have any further questions? Judge Wynn, do you have questions? Thank you very much. Let's hear from Mr. Ferguson. He has some rebuttal time. I would like to make two brief points. First, my friend on the other side repeatedly refers to the right in this case as the general constitutional right to be free of deliberate indifference. That is the right definition that the Supreme Court has consistently reversed for. Second, my friend on the other side repeatedly refers to the right in this case as the general constitutional  be free  indifference. That is the right definition that the Supreme Court has consistently reversed for. Third, my friend on the other side repeatedly refers to the right in this case as the general constitutional right to be free of deliberate  That is the right definition that the Supreme Court has consistently reversed for. Fourth, my friend on the other side repeatedly refers to the right in this case as the general constitutional right to be free of deliberate That is the right definition  Supreme Court has consistently reversed for.     repeatedly refers to the right in this case as the general constitutional right to be free of deliberate That is the right definition that the Supreme Court   reversed for. Fifth, my friend on the  repeatedly refers to the right  case as the general constitutional right to be free of deliberate That is the right definition that the Supreme Court has consistently reversed for. Second, as to the Eighth Amendment claim, I agree with Judge Wilkinson's observations that there is a very long spectrum between negligence and deliberate indifference. In this case, all the evidence shows that once Mr. Fowler's scores passed that 1.5 cutoff, which Dr. Wang mistakenly believed to be the cutoff under the guidelines, he did provide quite a lot of medical care. He referred  the Fibroscan test. Do you disagree that deliberate indifference can be shown by circumstantial evidence? It is not often the case that there is no direct evidence that Dr. Wang was deliberately indifferent, but look at what he did or didn't do. That is enough to get to a jury. We agree that deliberate indifference can be demonstrated through circumstantial evidence, but it can't be demonstrated just by speculation. If you are inferring deliberate indifference just from the fact that a reasonable person in those circumstances ought to have been aware of the risk,  are turning the deliberate indifference into a negligent standard. It has never been a negligent standard and it is not intended to be a negligent standard. It is an example where it is so obvious that someone was in immediate need of medical attention that in that case he was vomiting blood in front of the doctor that you can infer it from the obviousness. It is always a subjective standard. It is always a subjective standard. The question is always, what did this individual doctor actually know? At a certain level, it can be inferred from the obviousness because it is impossible that he could have failed to realize it. That is not the case here. It is very easy to understand how he made the mistake that he did. Mr. Fowler at that point was not showing symptoms of liver disease that would have obviously put him on notice. In the face of that, how do you explain that? Why couldn't a reasonable jury decide that? On top of that, recognizing  twice missed the cutoff of the guidelines, it just doesn't follow up until a year later. He did follow up two months later. At that point, he said schedule him for the FibroScan test ASAP. That makes this case quite different from the Bjorn case where the doctor never followed up at all. In the meantime, he was prescribing medications to treat the condition. He referred him for an MRI test as well. You can certainly say there was more he should have realized what should have been done, but in terms of saying what is the case, there is no such evidence here. For that reason, qualified immunity should be provided. I think the key word is deliberate indifference. It has to be a conscious disregard of a serious medical need. I come back to a conscious disregard. What separates deliberate indifference from  indifference is a different kind of men's ray. In men's ray terms, it is totally different because negligence is sloppiness, but there is nothing intentional about it. Deliberate indifference is phrased in terms of conscious intentionality and is a different level of men's ray entirely. It can't be sloppiness or negligence. It has to be a conscious disregard of a serious medical need. There is nothing about Dr. Wang's behavior that rises to the level of a conscious disregard of this individual. It's just not there, and the cases where deliberate indifference has gone to a jury are, without variation, significantly more serious than this. I realize that what happened here, I'm sad about it. I'm sorry about it. It is I wish things had turned out differently for the patient. I wish many, many times that things had turned out differently for the patients. I've had many friends die of cancer, of liver cancer, and the rest. Maybe I wish that something had been different or not, but I have never thought to blame the doctor for that. They're struggling against the difficult conditions. Cancer is a very hard thing to control, but I've had so many friends who have died from these terrible maladies, and it breaks my heart, but I haven't just gone after the doctor with some kind of suit. There's something different about it. It's a post hoc ergo proctor hoc. It's an old Latin phrase, that after something happens, it must have been because of something. And you just can't automatically take an admittedly sad outcome and throw overboard questions of law and go after physicians. I don't think the Supreme Court's law leads us in that direction. Okay. If my colleagues have any questions, we'll move into our last case here. I don't have a question, but I do want to at least express that I'm in agreement with Judge Wilkerson in the general case. This is a case that presents far more reaching issues. This individual is in prison. He develops Hepatitis C. He has a liver disease that's progressively getting bad. It is very aggressive. This doctor, on two occasions, could have been prepared if he had read properly the guidelines that were before him and sent him for proper treatment. Yet, by the time he did so, it was too late. This is not a cancer case where we have conscious treatment. I don't believe in blaming doctors for that kind of thing. I don't know how it turns out, but at the end of the day, the question is why should the jury decide this? That's just a comment. We're not insensitive to doctors and what they do out there, but we are mindful of our duties as judges when we put people in prison and develop terminal type illnesses that continue to progress because the doctor says I made a mistake. One mistake might cut it, but the liver disease was getting worse and worse and it got to the point by the time he got it too late. I just want to add that comment to the record because I don't    good argument. I think it's the last word. I want to thank both of you, all three of you, on the different sides of this case for your good arguments. The court appreciates it very much. We'll move directly into our final case. Thank you.
judges: J. Harvie Wilkinson III, James Andrew Wynn, Albert Diaz